# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### SHREVEPORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION NO. 18-120-01 |
| VERSUS | JUDGE ELIZABETH E. FOOTE |
| JOHN OWINGS | MAGISTRATE JUDGE HORNSBY |

## MEMORANDUM RULING

Before the Court is a motion for mistrial, filed by the Defendant, John Owings ("Owings").  Record Document 84.  The Government opposes the motion, and both parties have filed supplemental briefing on this issue.  Because the Court finds the extraneous evidence submitted to the jury did not prejudice the Defendant, the motion for mistrial is **DENIED**.

## I.   Background.

Owings was charged in a federal Indictment with twenty counts of theft of government property, in violation of 18 U.S.C. § 641, and one count of concealing or failing to disclose an event affecting a right to a Title II benefit, in violation of 42 U.S.C. § 408(a)(4).  These charges stemmed from Owings's receipt of disability insurance benefits from the Social Security Administration ("SSA") over a period of several years. Each of the first twenty counts corresponded to a disability payment Owings allegedly wrongfully obtained from the SSA.  Count Twenty-One related to Owings's intentional failure to inform SSA that he was employed, resulting in his continued receipt of disability benefits.  Owings admitted he was employed for part of the time that he received disability benefits, but denied intentionally receiving the benefits and also denied failing

to disclose his employment to the SSA.  A jury trial began on January 28, 2019, and on February 1, 2019, the jury returned a verdict of guilty on all counts.  Record Document 90.

The instant motion for mistrial relates to evidence contained within the Government's exhibit book that was, for a period of time, inadvertently available to the jury during its deliberations.  Only one exhibit, Government Exhibit 2, is at issue here. This exhibit was referred to by the parties as the SSA correspondence file because it contained correspondence SSA sent to Owings in the years relevant to this case.  The defense prepared an identical exhibit of the SSA correspondence file that was labeled Defense Exhibit 205.  Defense Exhibit 205 consisted of the exact same set of documents as Government Exhibit 2.  Trial Transcript p. 4, Record Document 98, p. 4; Trial Transcript pp. 206-07, Record Document 99, pp. 139-40.  In advance of trial, the Government and defense agreed that many exhibits, including Exhibit 2, were admissible at trial without any objection from either side.  See, e.g., Trial Transcript p. 144, Record Document 99, p. 77 ("Ms. Buckle: . . . the Government's Exhibits that were previously marked as Exhibits 2 and 3, all page numbers in those exhibits, we have no objection to.").  The defense decided that because these were identical exhibits, it would simply utilize Government Exhibit 2, rather than Defense Exhibit 205, in order to avoid confusion.  Trial Transcript p. 4, Record Document 98, p. 4.

In this case, several of the Government's exhibits were voluminous, and the Government anticipated moving into evidence every page of those exhibits for the sake of completeness, even though many of the pages would not be shown or addressed

during trial.   The defense agreed with this method of admitting the evidence and repeatedly stated that it had no objection to Government Exhibit 2.  See Trial Transcript p. 80, Record Document 99, p. 13 ("Ms. Buckle: . . . [W]e believed that all of Exhibit 2 of the Government would be admissible.").   The Court, however, refused to permit either side to do what it called "a document dump" on the jury, explaining

> the jury is then forced to go through documents that have not been gone over in trial, so that their deliberations are extended unnecessarily. Secondly, and perhaps most importantly, what you do is: By taking an entire group of records just for the sake of completeness, you risk giving the jury extraneous information the relevance of which has not been demonstrated to them, and you leave them to guess the relevance and importance of those documents.
>
> . . .
>
> So that is the Court's concern about these documents and the volume of these documents.
>
> . . .
>
> . . . I say these things to impress upon the Government the risk – and to the defense, the risk of putting these documents into evidence.

Trial Transcript pp. 78-79, Record Document 99, pp. 11-12.

Thus, the Court's rule was that each page of an exhibit that the parties intended for the jury to have for review during deliberations needed to be introduced in trial. The pages could be independently relevant or could be relevant in order to establish context, but whatever the relevance may be, they had to be shown or addressed during trial. Given that both sides agreed that Exhibit 2 was admissible and neither party had any objection to any page therein, the Court stated, "the Court will allow any of the documents from that group to be admitted into evidence.  But be very careful as to what you're referring because those will be the exhibits, then, that will go back to the jury."   Trial

Transcript p. 145, Record Document 99, p. 78.  It subsequently repeated this instruction, explaining that "anything you choose to accept from that sequence of Exhibit 2 is admissible as long as you get with [the courtroom deputy] afterwards and make sure that she has a proper list of the things that you've shown the jury."  Trial Transcript p. 237, Record Document 99, p. 170.

On the fourth day of trial, at 10:57 a.m., the jury retired to begin its deliberations. Roughly three hours later, the Government alerted the Court that some pages of Exhibit 2 which had not been introduced during trial were inadvertently included in the set of exhibits sent to the jury room.[1]  To be clear, these were pages of Exhibit 2 which the defense had previously agreed were admissible, but they were not admitted because of the Court's efforts to prevent a document dump on the jury.  The Court retrieved the exhibit book from the jury and held a conference with the parties.  Trial Transcript p. 625, Record Document 101, p. 77.   The Government apologized and accepted responsibility for the error, stating "I apologize; I'll take full responsibility for what happened.  Your Honor, it appears the review of notes in the case, I mistakenly notated what came into evidence.  An additional eight letters went back—I believe went back to the jury."  Trial Transcript pp. 624-25, Record Document 101, pp. 76-77.  The Court responded, "yes, indeed, you should accept full responsibility for this. The Court made it abundantly clear every day, several times a day, that it was going to be up to the parties

[1] The relevant thirty-eight pages from Exhibit 2 are: 133-142, 147-156, 169-172, and 177-190.  Six of these pages were blank.  See Record Document 104-1, pp. 1-38.

to produce the exhibits that would go back to the jury." Trial Transcript p. 625, Record Document 101, p. 77.

The Court reviewed the thirty-eight pages of Exhibit 2 at issue and commented, "The Court would propose as a solution that we simply remove these from the binder. . . . I would remind [the defense] that you had stipulated to the admissibility of these documents prior to trial." Trial Transcript p. 627, Record Document 101, p. 79. The defense moved for a mistrial arguing, "the defense acknowledges that the authenticity of the documents had been stipulated to prior to trial. However, in the manner in which the case was tried, it was only the documents that were shown and the witnesses were questioned about, and so the jury has not had an opportunity to identify any relevance with respect to those specific documents." Trial Transcript p. 627, Record Document 101, p. 79. In response, the Court explained,

> . . . as the Court stated at the outset of defining this issue, that the parties submitted to the Court notebooks of exhibits. Each—they were presented to the Court as being *fait accomplis*; that is, that these would be the exhibits that would be introduced by everyone at trial and that everyone had agreed, not simply to the authenticity which was stipulated to in the stipulation, but also to the admissibility of those documents. It was only the Court that limited the number of documents that would go to the jury to those documents which were explicitly used at trial.
>
> I only say this to say that sitting right here today, it's very hard for me to see the prejudice based on the parties' behavior, including the defense, with regard to these documents. All of the parties came to court expecting that all of the documents in the Government's Section 02 were going to be put into evidence. It was this judge that limited it because it did not want a document dump on the jury.

Trial Transcript p. 628, Record Document 101, p. 80.

In reply, the defense argued, "based on the Court's ruling, we did only introduce those [documents] which the witnesses were able to explain the relevance of.  And so now there have been documents and it was not the complete file that the jury was able to review."  Trial Transcript p. 629, Record Document 101, p. 81.  The Court observed that the pages "appear to be either cumulative or—at this point, sitting right here, and based on the parties' positions prior to the Court's limitation, I do not see the prejudice to the defense."  Trial Transcript p. 629; Record Document 101, p. 81.  The motion for mistrial was taken under advisement.

Turning to the issue of a solution, the parties agreed that the Court should remove the pages from the jury's exhibit book.  Trial Transcript p. 630, Record Document 101, p. 82.  The Court proposed that an explanatory note be sent back to the jury when the exhibit book was returned, but defense counsel offered, "AUSA Reeg and I have discussed it, and I think both of us would agree that it could go back with no note as well if the Court chose to do that."  Trial Transcript p. 632, Record Document 101, p. 84.  The Court declined that suggestion, concluding that an explanatory note would be necessary in case the jury noticed certain documents were missing.  The note that was delivered to the jury, with input from the parties, stated:

> The Court has removed from the Government's exhibit binder certain documents that the attorneys have discovered were inadvertently included and were not admitted into evidence.  These documents should be disregarded and should not affect your deliberations.

Record Document 91, p. 4.  The parties agreed the note "capture[d] everyone's sentiments."  Trial Transcript p. 634, Record Document 101, p. 86.  The defense did not

object to the Court's handling of the situation, did not ask that the jury be questioned about its review of the exhibits, nor did it request any additional measures be taken.

The following day, the jury returned a verdict of guilty on all counts.  Record Document 90.  The Court set a date for sentencing without ruling on the motion for mistrial.  The defense did not raise the issue again either orally or through briefing. However, as the sentencing date drew closer and when the matter had not been pursued by the defense, the Court inquired of the defense's intentions and whether it wished to brief the issue since the record did not flesh out the Defendant's concerns. The defense responded that it still sought a mistrial.  Both parties requested sufficient time to review the trial transcript before submitting briefing on the matter.  The matter has now been fully briefed and is ripe for determination.[2]

## II.  <u>Law and Analysis</u>

The introduction of extrinsic material into the jury room impedes a defendant's Sixth Amendment right to an impartial jury and right to confrontation.  <u>United States v. Mix</u>, 791 F.3d 603, 608 (5th Cir. 2015).  "In any trial, there is initially a presumption of jury impartiality."  <u>United States v. O'Keefe</u>, 722 F.2d 1175, 1179 (5th Cir. 1983).  The introduction of extrinsic material into the jury room "requires a court to investigate the asserted impropriety."  <u>United States v. Davis</u>, 393 F.3d 540, 549 (5th Cir. 2004). However, courts are not required to conduct a "full-blown evidentiary hearing in every instance in which an outside influence is brought to bear upon a petit jury."  <u>United States</u>

---

[2] The defense also filed a motion for new trial on issues unrelated to Exhibit 2. That motion is not addressed in the instant ruling.

v. Bernard, 299 F.3d 467, 476 (5th Cir. 2002) (quoting United States v. Cantu, 167 F.3d 198, 201-02 (5th Cir. 1999)).  When determining whether a hearing is appropriate, the district court "must balance the probable harm resulting from the emphasis such action would place upon the misconduct and the disruption involved in conducting a hearing against the likely extent and gravity of the prejudice generated by the misconduct."  Id. at 477 (quoting United States v. Ramos, 71 F.3d 1150, 1153 (5th Cir. 1995)). [3]

While the jury is initially presumed to be impartial, that presumption can be overcome if the defendant presents evidence or at least a colorable showing that the extrinsic material likely caused prejudice, Mix, 791 F.3d at 608, or affected deliberations, United States v. Smith, 354 F.3d 390, 394-95 (5th Cir. 2003).[4]  To do so, the court must

---

[3] Here, the effect of the evidence would have been greatly outweighed by the disruption and prejudice of a hearing, which would only have highlighted the evidence for the jury.  This conclusion is underscored by the fact that defense counsel requested neither a polling of the jury nor any sort of contemporaneous investigation.

[4] In this case, Owings and the Government agree with one another on very little, but one thing on which they have reached an accord is the proposition that this Court must presume prejudice exists simply because extraneous material was introduced into the jury room.  In reaching this conclusion, both parties have relied on outdated jurisprudence. To be sure, the law used to be that "any intrusion on the jury, no matter how slight, creates a rebuttable presumption of prejudice." Smith, 354 F.3d at 395. This was supported by Supreme Court precedence in Remmer v. United States, 347 U.S. 227 (1954).  However, in United States v. Sylvester, 143 F.3d 923 (5th Cir. 1998), the Fifth Circuit explored the departure from this rule, noting that the Supreme Court's and other appellate courts' opinions indicated that the presumption of prejudice would not be automatic, but rather would be within the discretion of the court.  Id. at 933. The Fifth Circuit explained:

> We agree that the Remmer presumption of prejudice cannot survive . . . . Accordingly, the trial court must first assess the severity of the suspected intrusion; only when the court determines that prejudice is likely should the government be required to prove its absence.

Id. at 934.  The Court acknowledges that the Fifth Circuit's handling of this issue is sometimes muddled.  In short, however, prejudice will not be presumed by this Court.

consider whether the intrusion on the jury "is of a nature and degree that is likely to have a prejudicial effect." Smith, 354 F.3d at 395. Factors in this inquiry include whether the extrinsic information lent credence to or bolstered the Government's theory; whether it gave the defendant a motive to commit the crime; whether it gave a juror confidence in voting for guilt; or whether there is a temporal relationship between the receipt or review of the extrinsic information and the return of the guilty verdict. See Mix, 791 F.3d at 609-10.

If the defendant can successfully demonstrate prejudice, the burden shifts to the Government to prove a lack of prejudice, which requires it to show that there is "no reasonable possibility that the jury's verdict was influenced by the extrinsic evidence." Id. (quoting United States v. Davis, 393 F.3d 540, 549 (5th Cir. 2004)). In evaluating this

---

The question, then, is how the Court should assess prejudice at this initial stage. Sylvester instructs district courts to investigate the severity of the intrusion to determine whether prejudice is likely, but the Sylvester opinion does not clearly indicate who bears the burden. Smith, issued five years after Sylvester, plainly implies that the defendant bears the burden of establishing prejudice. Smith, 354 F.3d at 395 ("At the other end of the spectrum are cases like the present one, in which the defendant can do no more than show that the jury improperly learned of the existence of a transcript, but nothing of its contents. . . . Smith was unable to make a colorable showing of prejudice."). It was not until 2015, in Mix, that the Fifth Circuit, relying on Sylvester, explicitly stated that the defendant bears the burden. Mix, 791 F.3d at 608 ("To be entitled to a new trial based on an extrinsic influence on the jury, a defendant must first show that the extrinsic influence likely caused prejudice."). Accordingly, this Court finds that it is Owings's responsibility to first demonstrate prejudice before the Government will be required to prove the absence of prejudice.

The Court notes, however, that regardless of who ultimately carries the burden on the prejudice inquiry, an assessment of the evidence reveals no likelihood of prejudice, as discussed below.

issue, the district court should consider "the content of the extrinsic material, the manner in which it came to the jury's attention, and the weight of the evidence against the defendant." United States v. Ruggiero, 56 F.3d 647, 653 (5th Cir. 1995).

A.    Likelihood of Prejudice.

The defense argues that the unadmitted pages of Exhibit 2 were so prejudicial that a mistrial is warranted.  The Government submits that the documents were cumulative, harmless, or both, and thus were not prejudicial.  The Court's ruling will address the specific documents challenged by the defense in turn.

    1.    002-134

Exhibit 002-134 is entitled "Title II Datasheet."  Record Document 104-1, p. 2.  It evidently originated from an internal SSA database.  The defense argues merely that this page is "clotted jargon of an unexplained computer form."  Record Document 104, p. 13. The fact that the defense cannot explain the significance—or even meaning—of this document highlights its inability to demonstrate how the document is prejudicial.  This page did not prejudice the Defendant.

    2.    002-135 — 002-137 and 002-139 — 002-141

This range of pages consists of two letters from SSA to Owings regarding his Medicare Part B premiums, specifically what portion of his premium Owings was responsible for paying and SSA's intent to deduct Owings's past-due premiums from his monthly disability check.  Record Document 104-1, pp. 3-5 & 7-9.  The Defendant contends that his Medicare premium was not relevant to this case and that these two letters introduced "another allegation against Dr. Owings . . . in a form designed to

suggest that Dr. Owings owed the Social Security Administration additional money, this time for his medical insurance coverage . . . ."  Record Document 104, pp. 12-13.  The defense submits this was a "grievous injustice."  Id. at 13.  The Government asserts that the letters are cumulative of other exhibits that were introduced at trial, namely 002-035 — 002-037 and 002-039 — 002-042, and therefore are not prejudicial.

The Court has reviewed the exhibits and agrees that the first letter (002-135 — 002-137), which was not admitted, is largely cumulative of other exhibits introduced at trial, namely 002-035 – 002-042, 002-084 — 002-090, 002-092 — 002-098, 002-126, and 002-157 – 002-158.  There was testimony from SSA witness Liana Smith ("Smith") that these letters, known as the "November letters," were sent out annually by the SSA regarding a beneficiary's Medicare premium; the premium amount was derived from a formula transmitted to the SSA by the IRS which, in turn, was based on information contained within a beneficiary's tax returns.   Trial Transcript pp. 139-40, Record Document 99, pp. 72-73.   Smith testified that the Medicare premiums were to be deducted from a beneficiary's monthly Social Security check.   Trial Transcript p. 140, Record Document 99, p. 73.  Here, while the Medicare premiums and monthly benefits may have differed from letter to letter, the purpose and content of the November letters were otherwise consistent.   The defense cross-examined Smith about the Medicare premiums, therein touching upon the fact that the premiums were deducted from Owings's monthly checks. Trial Transcript pp. 204-05, Record Document 99, pp. 137-38.  However, there is one discrepancy between 002-135 and the other cumulative exhibits mentioned above and that is that 002-135 states that Owings's Medicare premium is

being increased and that he will owe SSA money for the prior months in which a lesser amount was paid.  This aspect of the November letter relates to the second letter at issue and will be examined separately, below.  As to the remainder of the content of this November letter, the Court does not find it to be prejudicial.

The second letter is 002-139 — 002-141.  These three pages constitute one December 2, 2015, letter from SSA to Owings.  Record Document 104-1, pp. 7-9.   To the best of the Court's review of the record, this letter is not cumulative of other exhibits.  This December letter is a follow-up to 002-135, which is the prior month's November letter regarding the increase in Owings's Medicare premium.  In the December letter, SSA informs Owings that his next disability check will be offset to account for the increase to his 2014 Medicare premiums.  Record Document 104-1, p. 7.  Thus, instead of $2,145, his next check would be in the amount of $1,389.  Id.  "After that you will receive $2,145 . . . each month."  Id.  The Court could not locate another admitted exhibit that specifically discussed deductions from monthly disability checks in order to recoup past-due Medicare premiums.

While the Court does not find 002-135 and 002-139 to be cumulative evidence as the Government suggests, it does agree that 002-140 and 002-141 (the second and third pages of the December letter) are duplicative of the bulk of SSA correspondence, in that they detail basics like how to dispute SSA's decision, how to obtain help to appeal a decision, and how to contact SSA.  Thus, it is only the first page of the November and the first page of the December letters that are unique.  However, that characteristic alone does not render the content prejudicial.  In this case, the jury was informed a number of

times that Owings received Medicare coverage, and it was well-established in the evidence that SSA deducted his premiums from his monthly disability checks. Correspondence that discusses recouping a past-due premium of $756 is hardly prejudicial in the context of this case, when the amount of money Owings was accused of wrongfully taking from SSA was in the hundreds of thousands.

Further, these letters did not introduce another allegation against Owings, as suggested by defense counsel.  To be sure, there is no hint of impropriety.  SSA's correspondence did not imply that Owings had fraudulently or wrongfully withheld the premiums.[5] This was an accounting decision made by SSA and reported to Owings. Owings was not prejudiced by these pages.

3.   002-147 — 002-156 and 002-169 — 002-172

These two sets of documents are comprised of correspondence to Owings from SSA in reference to one of Owings's minor children.  Record Document 104-1, pp. 11-20, 21-24.  Three of these pages are completely blank.  The others solicit updated information from Owings regarding benefits paid on behalf of his child.  Three of the letters are relative duplicates, the only differences being that one was mailed in March of 2016, one was mailed in April of 2016, while the last was mailed in 2017.  The only other letter in this set of exhibits simply asks Owings to contact SSA regarding his daughter's account.

---

[5] This would seem impossible in any event since SSA's process entails it withholding each month's premiums from a beneficiary's payment rather than having the beneficiary affirmatively submit a monthly payment.

It is hard to grasp the prejudice these exhibits would have caused, and Owings has not attempted to identify any prejudice.   To be sure, all he says about these documents is that there were "multiple documents referencing payments made to Dr. Owings on behalf of his minor children, when such payments were not the direct subject of the superseding indictment against him."   Record Document 104, p. 13.   From that basic statement, Owings leaps to the unfounded conclusion that "Dr. Owings was deprived of both his right to trial by an impartial, unprejudiced jury, and his right to due process."   Id. The Court refuses to make a similar leap in logic by accepting unsupported and conclusory allegations in lieu of evidence of prejudice.   There was plenty of discussion during the trial about Owings's minor children and the jury was well aware of the fact that both of his children were entitled to benefits arising from Owings's disabled status. That they received monthly checks from SSA was the subject of testimony and borne out by the exhibits.   Owings himself testified to this fact on direct examination by his own counsel.   Trial Transcript pp. 441-42, Record Document 100, pp. 98-99.   Against that backdrop, the Court is hard-pressed to find any prejudice stemming from SSA letters to Owings regarding his daughter's account, especially letters that merely seek information from the beneficiary himself.   This evidence was not prejudicial.

4.    002-179 — 002-188

It is this section of documents to which the defense devotes the bulk of its attention.   It claims that these documents contained prejudicial errors that were contradicted by the testimony and exhibits at trial.   002-179 — 002-183 comprise one SSA letter dated May 12, 2017.   Record Document 104-1, pp. 27-31.   In this letter,

however,  Owings attacks only one page, 002-180.  There, SSA summarized its belief that
Owings was working during periods in which he was also receiving disability payments.
Owings was entitled to disability benefits beginning in September 2007 and ending
sometime in early 2012.  <u>See</u> Government's Exhibit 002-031.  Exhibit 002-180 states that
SSA's records show that between January 2010 and December 2011, Owings was self-
employed; that between January 2007 and December 2014, he was employed by the
Regents of the University of (presumably California); that between January 2008 and
December 2008, he was employed by Liberty Life Assurance Co.; and that starting in
January 2013, he was employed by Louisiana State University Health.  Record Document
104-1, p. 28.  The thrust of Owings's argument is that this information was inaccurate
and prejudicial, mainly because other evidence showed that the payments from the
University of California and Liberty Life Assurance were not wages but rather disability
insurance payments.  The defense submits that the SSA letter gave jurors the false
impression that Owings was working and earning wages from 2007 through 2012 while
he was simultaneously receiving disability benefits.  More so, the defense argues that
"[i]f this document had been offered in evidence by the Government, Dr. Owings' counsel
could have destroyed it for the farrago of deceit it is."  Record Document 104, p. 12.

Contrary to Owings's recollection, the type of information contained within this
letter <u>was</u> actually explored at trial.  To be sure, the jury was informed that Owings
received payments from the University of California and from Liberty Life Assurance. The
jury learned that those payments were disability payments, rather than wages from
employment.  Trial Transcript p. 98, Record Document 99, p. 31; Trial Transcript pp. 145-

146, Record Document 99, pp. 78-79; Trial Transcript pp. 148-49, Record Document 99, pp. 81-82; and Trial Transcript pp. 421-22, Record Document 100, pp. 78-79.  And indeed, this very same information was included in another exhibit, Government 002-213, that was actually introduced at trial.  Trial Transcript pp. 181-82, Record Document 99, pp. 114-15.    Thus, the very information about which the defense complains was properly admitted at trial, it was the subject of repeated testimony, and the defense had the opportunity to correct any inaccuracies it believed were contained therein.

In addition, the jury saw Government Exhibits 003-077 — 003-078 which are part of an SSA work activity report completed by Owings, in which he refuted the very facts that were inaccurate above. Put simply, in his own handwriting, Owings explained that the income from University of California and Liberty Life Assurance were the proceeds of a disability policy.  This, too, was explored during Owings's testimony.  Trial Transcript pp. 478-80, Record Document 100, pp. 135-37. The defense cannot now complain of any false impression left in the jury's mind when it had a full opportunity to challenge the accuracy of this information during trial.

With respect to 002-184 — 002-188, these pages consist of a chart created by SSA that documented Owings's monthly work and earnings and tracked his trial work periods. Record Document 104-1, pp. 32-36.  This chart was attached to the letter discussed above (002-179 — 002-183).  Owings criticizes internal inconsistencies between this chart and the letter to which it was attached, even though some of the contradictions inured to his benefit.  For example, he complains that while the letter stated Owings was employed during 2008 and 2009, the chart reported he had $0 income from February

2008 through December 2009.  So in essence, the chart reported that Owings earned no income while receiving Social Security benefits in this almost two-year period.  The defense agrees that the chart is correct—Owings earned no income during these months.  The Defendant has not explained how, then, the chart is prejudicial, and the Court is hard-pressed to understand it without explanation from the defense.

Next, Owings points out that although he testified that he worked part-time in early 2012 and returned to work full-time in July 2012, the SSA chart reflects $0 income for all of 2012.  Again, the Court does not grasp how this information—though it may be inaccurate—can be prejudicial to Owings.  If anything, it casts him in a more favorable light by showing he was not receiving wages while accepting disability benefits.  Or, alternatively, it casts SSA in a poor light for the internal inconsistencies rife within its own documentation, a flaw that was highlighted during trial.  This would tend to support, not detract from, Owings's defense.

Owings also faults the chart for breaking up a bulk wages payment received during one month into equal monthly payments spread out over the course of twelve months.  While the Court understands Owings did not receive twelve smaller payments, but rather one lump sum, the same total figure was communicated to the jury.  This was not prejudicial.

Owings next challenges the chart because it reports monthly income of $4,653 for each month of 2011, which, according to the defense, is "disturbing" and "pure fabrication."  Record Document 104, p. 11.  The Government responds that the Indictment's charges began in 2012, and thus the jury was not asked to make any

determinations as to Owings's work during 2011.  The Court agrees that 2011 was not the subject of the criminal charges, and the parties made clear during trial that any wrongful receipt of benefits did not begin until 2012.  Thus, information about 2011 was not prejudicial.  This is especially so when the chart that inflates income for one year— 2011— also underreports income the following year— 2012, which was a year relevant to the charges in the Indictment.  Again, as discussed above, the chart reflected $0 monthly income for all of 2012, which was inaccurate.  The Court finds Owings benefitted from the fact that he was reported to have $0 income during the first year at issue in the Indictment.  No prejudice arises.

      5.     Cumulative Effect.

Lastly, to the extent the Defendant challenges the cumulative effect of the exhibits, the Court finds that even cumulatively, the pages did not prejudice Owings for the reasons set forth above.  Further, the defense commenced this trial knowing that neither it nor the Government intended to review every page of Exhibit 2 with a witness.  To suggest that the Defendant would have examined every page of the entire exhibit had it been admitted into evidence is belied by the defense team's actions and representations preceding this error.  The defense always maintained that these pages should be admitted and be available for review by the jury, and it never evidenced any concern about the independent relevance of each page.  In addition, arguing the information in Exhibit 2 is not only false, but also prejudicial and inflammatory, is in patent conflict with the Defendant's steadfast intention for the jury to review Exhibit 2 during deliberations.  In short, the defense is now assuming a posture it never endorsed during trial and is

complaining about the effects of a process it helped to create.  There is no cumulative prejudice.

6.      Overall Assessment of Prejudice.

As discussed above, the Court concludes that some pages of Exhibit 2 were cumulative of other evidence; they were the subject of testimony, some by the Defendant himself; and some inaccuracies benefitted Owings, while others supported his defense that the SSA routinely submitted vague, ambiguous, and inconsistent correspondence to beneficiaries.  The Court finds that these pages did not prejudice the Defendant.  Even if they did, they had no reasonable possibility of affecting the jury's verdict in this case. Bolstering that conclusion is this Court's instruction to the jury to disregard these documents in its deliberations.  One fundamental tenet of law is that "jurors are presumed to follow the instructions given to them by the court."  United States v. Nieto, 721 F.3d 357, 371 (5th Cir. 2013).  There is no basis to disregard that presumption in this case.

Furthermore, the jury had the unadmitted documents for less than three hours. After those documents were removed from the exhibit book, the jury continued to deliberate the remainder of that day and until 10:49 a.m. the following morning before returning a verdict of guilty on all counts.  The Court's cautionary instruction and the temporal remoteness between the potential review of the documents and the rendering of a verdict supports the Court's findings.

The Court holds that the Defendant has not carried his burden of demonstrating that prejudice resulted from the pages inadvertently submitted to the jury.  Moreover, a review of the guiding jurisprudence confirms that the information at issue in this case is

more innocuous and less prejudicial than in other cases in which courts have refused to grant a new trial or a mistrial.  See United States v. Hemphill, 642 F. App'x 448 (5th Cir. 2016) (motion for new trial denied because unadmitted photograph of defendant that was mistakenly given to the jury was neutral and not inherently prejudicial even though jury may have used the photograph as a tool to identify the defendant in a video recording of a drug deal); Davis, 393 F.3d 540 (mistrial not warranted when news reporter asked juror whether there was going to be a "deal cut today" and juror reported that comment to other jurors; comment was vague and had no reasonable possibility of affecting the verdict when the weight of the evidence against the defendant was substantial); Smith, 354 F.3d 390 (new trial properly denied where defendant could not show prejudice stemming from jury learning that a transcript existed of a witness statement to the ATF but jury did not learn of its contents); Bernard, 299 F.3d 467 (jury was not improperly tainted when someone outside of the courthouse told them that "someone is going to die in that trial today" and extra security measures were taken); United States v. Johnson, 192 F.3d 126 (5th Cir. 1999) (new trial not warranted where jury considered unadmitted maps of Houston and Lafayette areas because the information to be learned by review of the maps (location) was not a key component of the trial, and if it had been, either side could have admitted the maps into evidence); Ruggiero, 56 F.3d 647 (new trial and mistrial not warranted where juror learned that defendant had been in trouble before and juror was told that Government's star witness was a nice guy; juror did not reveal that information to anyone else until after the verdict, the weight of the evidence against the defendant was strong, and the jury had already learned through testimony that the star

witness had repeatedly lied to authorities); <u>United States v. Ortiz</u>, 942 F.2d 903 (5th Cir. 1991) (new trial not warranted where one juror investigated the airport involved in drug smuggling; a second juror drove by an apartment complex discussed during trial and described the complex to the other jurors; and a third juror stated that she knew one of the individuals mentioned during trial, that she knew he was a drug dealer, and that the defendants were guilty).[6]

**III.   <u>Conclusion.</u>**

For the reasons discussed above, the Court finds that the thirty-eight pages of Government Exhibit 2 that were not introduced at trial but which were inadvertently provided to the jury were not prejudicial and had no reasonable possibility of impacting the jury's deliberations in this case.  These pages were non-prejudicial, cumulative of other evidence, and/or contained sufficiently similar content to that addressed in other exhibits and witness testimony, including by the Defendant himself.  Accordingly, Owings's motion for mistrial [Record Document 84] be and is hereby **DENIED**.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, on this 22nd day of October, 2020.

ELIZABETH E. FOOTE
UNITED STATES DISTRICT JUDGE

---

[6] <u>Compare with</u> <u>United States v. Davis</u>, 2019 WL 1896555 (M.D. La. Apr. 29, 2019) (new trial granted when the extraneous information about defendant's prior conviction directly related to the very trial at issue and was communicated to the jury by the foreman); <u>Mix</u>, 791 F.3d 603 (new trial granted when jury foreperson told jury she overheard information that increased her confidence in voting guilty).