UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 18-120 |
| VERSUS | JUDGE ELIZABETH E. FOOTE |
| JOHN OWINGS | MAGISTRATE JUDGE HORNSBY |

**MEMORANDUM RULING**

Before the Court is a motion for new trial, filed by the Defendant John Owings ("Owings"). Record Document 113. In this motion, Owings argues that he is entitled to a new trial because months after trial concluded in this case, the Social Security Administration ("SSA") mailed him many Social Security letters upon which the Government's circumstantial case was based—letters he claimed at trial never to have received. The Government opposes the motion, and both parties have filed supplemental briefing. Because the Court finds that Owings has failed to carry his burden on this issue, his motion for a new trial is **DENIED**.

**I.   Background.**

Owings was charged in a federal Indictment with twenty counts of theft of government property, in violation of 18 U.S.C. § 641, and one count of concealing or failing to disclose an event affecting a right to a Title II benefit, in violation of 42 U.S.C. § 408(a)(4). These charges stemmed from his receipt of SSA disability insurance benefits over a period of several years. Each of the first twenty counts corresponded to a disability payment Owings wrongfully obtained from the SSA. Count Twenty-One related to Owings's intentional failure to inform SSA that he was employed, resulting in his continued

1

receipt of disability benefits. Owings admitted he was employed for part of the time that he received disability benefits, but denied intentionally receiving the benefits and also denied failing to disclose his employment to the SSA. A jury trial began on January 28, 2019, and on February 1, 2019, the jury returned a verdict of guilty on all counts. Record Document 90.

At trial, a common thread in the Government's and defense's cases was the number and content of SSA letters that were mailed to Owings over a span of several years. The letters were relevant because Owings's defense at trial was that he did not receive all the letters that the SSA accused him of receiving and ignoring, which contributed to his continued receipt of benefits to which he was not entitled. An SSA representative testified about the correspondence, how these letters were generated to beneficiaries, and how the letters were mailed out. Owings testified that he did not recall ever receiving these letters, either at his former address in California or at his current address in Shreveport, Louisiana.

On June 29, 2019, after trial concluded but prior to sentencing, Owings received thirty-two letters from SSA. When he read those letters, he realized that they were copies of the SSA letters he had been questioned about at trial—the letters he testified that he had never received. On July 1, 2019, Owings received four more letters. He then received ten letters that had been sent to and forwarded from his former home in California. The number of letters he received in the summer of 2019 totaled forty-six. Owings asserts that the 2019 letters are the documents that he had never seen before now, aside from in discovery.

The instant motion is premised entirely on the 2019 post-trial mailing of the previously-authored SSA letters to Owings regarding the parameters of his, and his daughters', entitlement to benefits. He contention is that SSA must have realized after trial that it had not, in fact, sent these letters to Owings before he was indicted or even on trial, and therefore in an underhanded attempt to remedy its error, SSA mailed the letters in the summer of 2019 after he had been convicted at trial.  The defendant asserts that at trial, the Government used "inference and innuendo to influence the jury to conclude that Dr. Owings was lying; that in fact he had received the letters he was denying." Record Document 112, p. 8.  Owings argues that it is reasonable to conclude that SSA now agrees with him that he had never received these letters before.

In response to Owings's motion, the Government agrees that SSA sent Owings a series of letters in the summer of 2019, after trial concluded.  However, it characterizes this not as a belated and nefarious attempt to correct the accuracy of the record, but rather as "the careless, post-trial actions of an investigating agent [who was] accessing the defendant's online correspondence file."  Record Document 115, p. 2.  The Government explains both how and why the SSA letters were mailed to Owings in the summer of 2019. It submits that on June 24, 2019, Special Agent Suzanne Guenin ("Special Agent Guenin") accessed the SSA online retrieval system to show another agent how to access and download a correspondence file in preparation for a criminal trial.  In an effort to refresh her memory on how the process worked when she did the same thing for the Owings case, Special Agent Guenin accessed the Owings correspondence file. She then selected correspondence documents and clicked "central print."  She believed that

3

by clicking the central print button, the system would create a .pdf file. She later learned, however, from Technical Security Expert Jennifer Gunn ("Gunn") with the SSA Center for Automation, Security, and Integrity, that when the central print button is selected, "any notices that were check marked get printed and mailed from a central location in Baltimore, MD, SSA Headquarters. This is known as a 'batch print process.' " Record Document 115-2, p. 1.

Gunn was able to look into the documents printed from the Owings file and confirm that Special Agent Guenin was the only person who accessed the file, and Gunn verified that Special Agent Guenin accessed it on June 24, 2019. Id. at p. 2. This date corresponds with the approximate timeframe when the SSA letters were mailed to Owings. Id. Thus, as the Government explains, when Special Agent Guenin selected Owings's correspondence file and clicked central print, she unknowingly caused the SSA to "mail out, again, all of the correspondence" in his file. Record Document 115, p. 3.

The issue before the Court is whether Owings is entitled to a new trial based on the 2019 mailings of the SSA letters. The Court has been presented with affidavits from both Special Agent Guenin and Gunn explaining precisely what happened to cause the mailings, and those affidavits are uncontested by the defense.

**II.     Standard of Review for a New Trial.**

Federal Rule of Criminal Procedure 33 allows a court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Cr. P. 33(a). The rule specifically contemplates the discovery of new evidence as a basis for this type of motion. "Such motions are disfavored and reviewed with great caution." United States v. Turner,

674 F.3d 420, 429 (5th Cir. 2012).  Even though district courts are vested with the ability to grant a new trial when the interests of justice require it, "this power should be exercised infrequently by district courts, unless warranted by 'exceptional' circumstances." United States v. Tarango, 396 F.3d 666, 672 (5th Cir. 2005) (citing United States v. Scroggins, 379 F.3d 233, 239 (5th Cir. 2004)).  The remedy of a new trial is "rarely" granted, United States v. O'Keefe, 128 F.3d 885, 898 (5th Cir. 1997), "unless there would be a miscarriage of justice or the weight of evidence preponderates against the verdict," United States v. Wright, 634 F.3d 770, 775 (5th Cir. 2011).  As the Fifth Circuit has explained, "finality remains a paramount concern unless the defendant can show that an injustice occurred."  United States v. Medina, 118 F.3d 371, 373 (5th Cir. 1997).  Indeed, "the primary purpose of the newly discovered evidence rule is to afford relief when, despite the fair conduct of the trial, . . . facts unknown at the trial make clear that substantial justice was not done."  Id. (quoting United States v. Ugalde, 861 F.2d 802, 807 (5th Cir. 1988)) (cleaned up).  It is the defendant's burden to demonstrate that a new trial is warranted.  United States v. Soto-Silva, 129 F.3d 340, 343 (5th Cir. 1997).

In reviewing a motion for new trial based on the weight of the evidence, the Court is permitted to weigh the evidence and assess the credibility of the witnesses.  See United States v. Ramos-Cardenas, 524 F.3d 600, 605 (5th Cir. 2008).  "But the 'court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable.'"  Id. (quoting United States v. Robertson, 110 F.3d 1113 (5th Cir. 1997)).  Instead, the "evidence must preponderate heavily against the verdict" such that allowing the verdict to stand would constitute a miscarriage of justice.  Id.

In the Fifth Circuit, district courts employ the "Berry" test to analyze motions for new trial based on newly discovered evidence.[1] United States v. Freeman, 77 F.3d 812, 816 (5th Cir. 1996). There are five elements which must be established by the defendant under the Berry rule: "(1) the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) the failure to detect the evidence was not due to a lack of diligence by the defendant; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence if introduced at a new trial would probably produce an acquittal." United States v. Wall, 389 F.3d 457, 467 (5th Cir. 2004). As the Fifth Circuit has often explained, "[i]f the defendant fails to demonstrate any one of these factors, the motion for new trial should be denied." Id.

### III. Analysis.

#### A. First Berry Factor: evidence unknown at time of trial

Under the first of the Berry factors, Owings argues that the 2019 mailings plainly constitute new evidence since they did not come into existence until after trial. Meanwhile, the Government contends that these letters are not new evidence, as they were provided in discovery and discussed at trial. The Government asserts that the defense is supplanting speculation for fact— that is, the fact that the letters were mailed in 2019 is being misconstrued as evidence that 2019 was the very first time they were ever mailed to Owings. Because the Government disagrees with this factual assertion, arguing instead that the 2019 batch of letters was the second time the letters were mailed out, it argues this is not new evidence.

---

[1] Berry v. Georgia, 10 Ga. 511 (Ga. 1851).

The Court finds that while the *substance* of the letters is not new to the defense, the physical mailings, and what they could possibly implicate, *is* new. The Court is not suggesting that it agrees with the defense's speculative conclusion that the 2019 batch of mailings was indeed the first time the letters were mailed to Owings, nor does the Court accept the defense's corollary conclusion as to the relevance and significance of these mailings. Rather, on a more rudimentary level, the Court simply observes that the letters were mailed post-trial, and the fact that they were mailed is new evidence. Thus, Owings has satisfied the first of the Berry factors.

B.   Second Berry Factor: diligence

Owings contends that there was no lack of diligence on his part in belatedly receiving these letters. Indeed, the mailing of the letters was always within the control of SSA. The Government agrees that if the new evidence is characterized as the mere fact that the mailings took place in 2019, then there was no lack of due diligence by Owings. The second Berry factor has been satisfied.

C.   Third Berry Factor: cumulative or impeaching evidence

Owings contends that this evidence would be independent proof to support his claims at trial that he never received the letters and saw them for the first time in discovery. The Government, on the other hand, argues that the letters would only be used to impeach an SSA witness about how SSA mailed these letters to Owings, when they were mailed, and where they were mailed. The Government is correct that evidence that is merely impeaching or cumulative falls short of satisfying Berry. "Impeachment testimony normally is not a basis for granting a motion for new trial." Wall, 389 F.3d at

7

470. However, if the evidence exonerates the defendant or "weigh[s] on any other issues that were before the jury," it may support a new trial. Id.

Evidence can be both independently relevant while also serving as a source of impeachment. These concepts are not mutually exclusive. The Court finds that the fact that the letters were mailed out after trial serves dual purposes. It could serve as impeachment evidence for the SSA witness, as suggested by the Government. The evidence could also be independent evidence that Owings could use to bolster his claim that he had never received the letters before trial, and as such, this weighs on an issue before the jury. Because there is a legitimate purpose other than impeachment, the third Berry factor has been met.

      D.    Fourth Berry Factor: materiality

Owings submits that the 2019 letters are material evidence, as they confirm his testimony at trial that he never received the letters in the first place. According to him, the letters tend to negate his criminal intent, or at the very least, introduction of them would have forced the Government to change trial strategies. In response, the Government states merely that the letters are "not relevant and ha[ve] no bearing on either the guilt or innocence of the defendant." Record Document 115, p. 5.

The Court finds the 2019 letters are not material. First, the Court observes that the topic of what letters SSA sent to Owings was explored at trial. True, the jury did not learn that SSA mailed forty-six letters to Owings after trial concluded and after a verdict had been reached. Nonetheless, the *relevance* of the mailings to the defense's theory, i.e., that they were *not* delivered, was thoroughly explored at trial, and the argument

8

that Owings did not receive any of them was repeatedly presented to the jury through direct testimony, cross-examination, and closing arguments. The jury knew the Government had no direct proof that the letters were mailed to Owings and that the Government had no direct proof that Owings received the letters. Indeed, the SSA witness's trial testimony never established that Owings actually received any of the letters. Rather, the witness explained extensively that the entire SSA mailing process is automated and handled by the SSA computer systems. She was asked on cross-examination how she knew Owings received the letters at issue and she responded, "I would have no idea. We wouldn't have any idea to know if he did or not." Record Document 99, p. 155.

Thus, the jury was aware throughout trial that the letters were automatically generated by an electronic process at SSA, they were automatically mailed out, and there was no direct proof that Owings ever received the letters. The jury heard Owings's testimony that he did not receive the letters. This theme was again argued by the defense in closing statements where counsel reminded the jury that the entire mailing process was automated and there was no proof that Owings ever received any letters. Record Document 101, pp. 57-58. Accordingly, the jury was presented with the defense's theory that Owings never actually received the letters. Nevertheless, the jury unanimously determined he was guilty on all counts. The fact that the letters were mailed again in 2019 would not alter that outcome.

Next, the Court notes that the Government's explanation of the 2019 mailings is uncontradicted evidence. Indeed, when the instant motion was filed, the defense initially

requested an evidentiary hearing. But, at the October 2020 status conference, defense counsel withdrew that request. See Record Document 127, p. 3. Indeed, during that conference, defense counsel acknowledged that a hearing was not warranted and "concede[d] that he has no evidence to counter the Social Security affidavit submitted by the Government . . . ." Id. Thus, the Government's proof, i.e., the sworn affidavits of Special Agent Guenin and Gunn, stands uncontroverted and is deemed credible by the Court. Consequently, the materiality of the evidence is viewed under the lens of the Government's explanation for it, as opposed to the defense's conclusory allegations. As such, the defense's assertion of materiality, and its attempt to satisfy Berry, rests entirely on unsubstantiated speculation which is squarely belied by the evidence presented by the Government. It is Owings's burden to establish materiality, and he has failed to carry his burden.

Third, the defense's laser focus on the letters is somewhat of a red herring, as the defense's suggestion is that the letters were the sole proof of Owings's guilt. This is far from true. The evidence introduced at trial demonstrated that Owings knew he was receiving benefits from the SSA, he knew his work limitations, he knew he returned to work full time, he knew he did not disclose his return to work to the SSA, and he knew he continued to receive disability benefit deposits in his bank account. There was also evidence that Owings steadfastly ignored his mail: at his California residence, the mail was stored in a closet,[2] while in Louisiana, it was piled on a table and then boxed up and

---

[2] In fact, Elizabeth Disbrow ("Disbrow"), Owings's wife, testified at trial that in California, "mail came through our mail slot that was in our front door, and when the pile got big enough that it was hard to push the door open, somebody went through it.

stored in the garage. Record Document 100, pp. 46-47. Indeed, at trial Disbrow was asked whether, at some point after meeting with SSA representatives about the overpayment of benefits, she found any prior letters that had been sent to Owings from SSA. Id. at p. 50. She answered, "We went into the garage, I went in the garage and pulled out the box, and there was one I think letter in the stuff in the garage. " Id. at pp. 50-51. That SSA letter had never been opened. Id. This consistent neglect of the mail Owings received was a theme in his case, as it supplied the jury with an excuse for his conduct. In fact, as noted by the Government, part of Owings's closing argument included the statement that Owings's "arena was in the operating room, not attending to chores in his house." Record Document 101, p. 45. Defense counsel also emphasized Owings's lack of criminal intent: "He had no criminal intent. How could he? [Elizabeth Disbrow] told us about the mail, how it was handled: ignored, thrown in a box. John testified that he received no letters from Social Security. He didn't know what was in them." Id.

Furthermore, the jury learned that Owings had admitted to SSA that he purposefully did not report his return to work. Indeed, Owings's sworn, written statement to the SSA stated, in pertinent part:

> I understand that I have been overpaid SSA benefits due to not reporting my work to the SSA. My two children have also been overpaid as auxiliaries. . . . I did not report my return to work because I had tried to return to work three previous times and was unsuccessful, so I was not sure this most recent attempt would work. After I was able to work full time again, I

---

Sort of we moved it into the closet that was by the front door. We did not do a very good job of dealing with the mail." Record Document 100, p. 40. When she was asked if she saw Owings opening mail on a regular basis, she said "No. I mean, it was just at the bottom of our priority list." Id.

began having problems with the IRS and felt overwhelmed. When the SSA contacted me recently about my work, I did not respond because I was scared.

Record Document 93-1, pp. 2-3.[3]

Plainly, the SSA letters were but one component of the evidence against Owings. Thus, the fact that the letters were mailed in 2019 neither "greatly strengthen[s] the defense's case," United States v. Piazza, 647 F.3d 559, 569 (5th Cir. 2011), nor does it "put the whole case in such a different light as to undermine confidence in the verdict," United States v. Sipe, 388 F.3d 471, 478 (5th Cir. 2004).[4] Owings has failed to satisfy the fourth standard of Berry. The Court's analysis could end here, as it is Owings's burden to establish all five of the Berry prongs. See Wall, 389 F.3d at 472 ("Failure to meet [the] burden as to any factor doom[s] [the] request for a new trial based on newly discovered evidence."). However, out of an abundance of caution, the Court will go on to address the fifth and final factor of Berry.

    E.    Fifth Berry Factor: weight of the evidence

Under this Berry factor, the Court examines whether if introduced at trial, the new evidence "*probably* would have resulted in an acquittal." Wall, 389 F.3d at 471. As discussed above, the only argument that Owings has to proffer with this new evidence is

---

[3] There was testimony at trial that Owings owed back taxes, penalties, and interest on prior disability insurance payments he had received. Record Document 100, pp. 39-40.
[4] Within the context of the duty to disclose exculpatory evidence, the United States Supreme Court has explained that, "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." United States v. Agurs, 427 U.S. 97, 110 (1976). Rather, "if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record." Id. at 112.

sheer speculation not only as to how it came about but also to its implication— that SSA employees knew they had failed to mail nearly fifty letters to Owings over a period of several years; they engaged in an underhanded scheme to correct their mistake; and they intentionally chose to take this action after he was convicted. To accept this proposition, the Court would have to accept a number of unfounded conclusions. In addition, to follow the defense's reasoning the Court would have to implicitly find: (1) that at least one SSA witness committed perjury during trial when describing the mailing system in use by SSA and how it was utilized to send letters to Owings; (2) that SSA, in an effort to cover its tracks, created two false affidavits to fraudulently conceal the reason for the 2019 mailings; (3) that two SSA employees intentionally lied in sworn statements to the Court; and (4) that Gunn knowingly used (and possibly created) fraudulent evidence to support her affidavit. The logical fallacies are obvious, as are the reasons the Court cannot abide them.

Again, the Government has submitted credible, admissible evidence attesting to the mistaken mailing of the 2019 letters. The defense has conceded it has no evidence to rebut those affidavits and it has declined an evidentiary hearing to further explore this matter. Owings has failed to satisfy his burden under the fifth <u>Berry</u> factor. Further, the ample evidence of guilt, described above, aptly demonstrates that the evidence adduced at trial firmly supports the jury's verdict.

**IV.     <u>Conclusion</u>.**

For the foregoing reasons, the Court finds that Owings has failed to establish his entitlement to a new trial under the governing <u>Berry</u> factors. Following a review of his

arguments, the Government's opposition, the affidavits submitted by the Government, as well as the evidence adduced at trial, the Court finds that the evidence strongly preponderates in favor of the guilty verdict. Accordingly, the motion for new trial is hereby **DENIED**.

      **THUS DONE AND SIGNED** this 30th day of April, 2021.

ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE